IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | Criminal No.   8:13-CR-296 (TJM) |
| | ) | |
| **v.** | ) | **Government's Trial Memorandum** |
| | ) | |
| **PATRICK LLOYD a.k.a.** | ) | |
| **"PROBLEM," "PROB," and "P," and** | ) | |
| **MICHAEL SPENCER a.k.a. "DON,"** | ) | |
| | ) | |
| | ) | |
| **Defendants.** | ) | |

**TRIAL MEMORANDUM**

**I.      Statement of the Case**

The defendants Patrick Lloyd and Michael Spencer are charged in a two-count third superseding indictment.  Count 1 charges the defendants with conspiracy to possess with intent to distribute and to distribute controlled substances, in violation of Title 21, United States Code, Sections 846 and 841(a)(1).  That violation involved 280 grams or more of a mixture and substance containing a detectable amount of cocaine base (crack), one kilogram or more of a mixture and substance containing a detectable amount of heroin, and 500 grams or more of a mixture and substance containing a detectable amount of cocaine, in violation of Title 21, United States Code, Sections 841(b)(1)(A) and (b)(1)(B).  Count 2 charges the defendant with possession of a firearm in furtherance of a drug trafficking crime, in violation of Title 21, United States Code, Section 924(c)(1)(A).  The indictment also alleges forfeiture of a $150,000 money judgment.

The defendants are in custody.  The trial is currently scheduled for August 11, 2015, and the government anticipates that it will take approximately five days.

## II.      Statement of Facts

The charges arise from the defendants' role in a drug trafficking organization ("the organization") that operated in Clinton County, St. Lawrence County, and elsewhere from at least sometime in 2012 through September 5, 2013.  In December 2012, members of the Border Enforcement Security Task Force ("BEST") began an investigation into the organization and a rival drug trafficking organization operated by Matthew Malu ("Malu organization").

Through the investigation, which included the use of Court authorized wiretaps, members of the BEST determined that Lloyd and Malu initially worked together to distribute controlled substances in the Massena area.  Sometime around the spring of 2012, they split up and became rivals.  Malu continued to distribute controlled substances with his rival organization.  The defendants coordinated the organization's efforts to obtain cocaine and heroin in New York City and transport it to the Massena via couriers, including coconspirators Bernie Russo, Travis Moore, Jon Garcia, and Justin Brailsford.  Once the drugs reached Massena, the defendants arranged for them to be stored at various stash houses, including with coconspirators Jessica Monaghan, Codi Burke, Leslie Moore, and Kimberly Jandrew.  From there, dealers like Monaghan, Burke, Moore, Jandrew, and coconspirator Catherine Berry distributed the drugs to their customer bases and provided the defendants with their profits.

Five cooperating witnesses ("Cooperating Witness #1," "Cooperating Witness #2," "Cooperating Witness #3," and "Cooperating Witness #4," and "Cooperating Witness #5") will testify that they worked in various roles for the organization that distributed crack, cocaine, and heroin through the Massena area during the timeframe alleged in the indictment.  The cooperating witnesses will also testify about events in which members of the organization and

rival organization were involved.  Specifically, the government intends to offer evidence of the following events.

First, sometime in the spring of 2012, Lloyd robbed Malu after which they stopped distributing controlled substances together.  Around that same time, Burke and Lloyd agreed to distribute controlled substances together.  However, Burke was arrested for an unrelated matter and could not make his bail.  So, on June 20, 2012, Lloyd and Spencer robbed and assaulted members of the Malu organization. They stole cocaine from the Malu organization and distributed it to make money for Burke's bail.  They were able to bail Burke out of jail and they began using him to distribute controlled substances for them.

On October 22, 2012, in retaliation for the June 20th assault, members of the Malu organization assaulted Lloyd and Spencer and their coconspirators at an apartment in Massena after Catherine Berry, who was distributing controlled substances for Lloyd but reporting back to the Malu organization, informed Malu of Lloyd's whereabouts.  After the assailants left, Lloyd went inside and found his coconspirators.  They had been stabbed, beaten, shot and tied up.

On December 22, 2012, Lloyd and coconspirators Jevar Sturridge and Travis Moore arranged for Bernie Russo to transport 177 grams of cocaine, 118 grams of heroin, and two firearms for the organization. Russo met Lloyd, Sturridge, and Moore at one of the organization's stash houses.  There, they loaded the bags containing the drugs and guns into Russo's truck.  Russo then left the stash house, traveling in tandem with Lloyd, Sturridge, and Moore toward Massena.  United States Border Patrol agents stopped Russo and Lloyd and seized the cocaine, heroin, and firearms.

A few months later, on February 16, 2013, Lloyd assaulted Berry in retaliation for the October 22, 2012 assault by the Malu organization.  He was arrested and charged with assault

and attempted kidnapping.  He eventually posted bail and was released on pretrial supervision. However, Lloyd was arrested again on April 11, 2013 at Jandrew's apartment and remained in custody throughout the pendency of the investigation.  Jandrew was also arrested that day after she admitted to officers that she had secreted drugs in her body.  Officers transported Jandrew to the hospital where she was found to be in possession of approximately 28 grams of cocaine.

On June 27, 2013, the Honorable Gary L. Sharpe, Chief United States District Judge for the Northern District of New York, authorized the interception of wire and electronic communications over four telephone numbers, including a number used by Jandrew and another number used by coconspirators Jessica Monaghan and Codi Burke.

Shortly thereafter, on July 7, 2013, agents seized cocaine and heroin from coconspirators Justin Brailsford and Jon Garcia after intercepted communications indicated Spencer arranged for Garcia to transport drugs to Plattsburgh, New York via bus.  The intercepted communications indicated Monaghan arranged for Brailsford to pick up Garcia from the bus station and drive him to Massena.  New York State troopers stopped Brailsford and Garcia for a traffic violation.  A drug detecting canine alerted to a duffel bag inside Brailsford's vehicle, which was found to contain approximately 1,160 packages of heroin and approximately 175 grams of cocaine. Troopers arrested Brailsford and Garcia.

Following that seizure, members of the BEST intercepted text messages and telephone calls between Monaghan, Burke, and Spencer in which they discussed the arrests and seizure.  In an effort to obtain money for the organization, Burke then attempted to sell a firearm to an unknown person on the Akwesasne Mohawk Indian Reservation.   The intercepted communications and surveillance establish that Burke traveled to Spencer's house to obtain the firearm, but spotted surveillance units and called it off.

4

Throughout the wiretap investigation, members of the BEST intercepted Lloyd's communications while he was incarcerated. Lloyd continued to monitor the daily activities of the organization from jail. His communications and those of others established that he arranged for Spencer and Monaghan to convince Berry to recant her statement regarding the assault and attempted kidnapping. At Lloyd's direction and with the organization's money, Spencer and Monaghan paid Berry to meet with a private investigator and recant her statement. Then, Monaghan gave Berry and Burke money to leave Massena and stay in a hotel to attempt to avoid being compelled to attend Lloyd's state court trial. Ultimately, Berry was subpoenaed and compelled to attend. Lloyd pled guilty to attempted kidnapping in the second degree at the last minute.

On September 5, 2013, members of the BEST executed search warrants at various residences. At Spencer's residence, agents seized: a 9 mm Taurus handgun with a loaded magazine; 2 grams of crack; a digital scale; an Orion flare gun modified to shoot .22 caliber rounds; a .25 caliber Titan handgun with a magazine and ammunition; and 30 grams of cocaine.

As mentioned above, the government intends to offer evidence of several seizures related to the organization: (1) the December 20, 2012 seizure of heroin, cocaine, and two firearms from Russo's truck; (2) the April 11, 2013 seizure of 28 grams of cocaine from Jandrew; (3) the July 7, 2013 seizure of heroin and cocaine from Garcia and Brailsford; and (4) the September 5, 2013 seizure of crack, cocaine, and firearms from Spencer's residence.

The defendants were arrested in connection with this matter on September 5, 2013. The government intends to offer defendant Spencer's post-*Miranda* statements from that date.

**III.     Statement of the Law**

        **a.   Count 1**

Count 1 of the indictment charges the defendants with conspiracy to distribute and possess with the intent to distribute controlled substances.  The elements of this offense are as follows:

First, that two or more persons entered into the unlawful agreement charged in Count 1 of the Indictment;

Second, that the defendant knowingly and willfully became a member of the conspiracy; and

Third, that the conspiracy involved the possession with intent to distribute or distribution of one or more controlled substances.

If the jury convicts the defendants of Count 1, it must then determine whether the participation of the defendants and the acts of others in furtherance of the conspiracy and reasonably foreseeable to defendants involved 280 grams or more of a mixture or substance containing crack, one kilogram or more of a mixture or substance containing heroin, and 500 grams or more of a mixture or substance containing cocaine.

Conspiracy is a separate and distinct crime from the substantive offense, which is the object of the conspiracy.  *United States v. Pickney*, 85 F.3d 4, 8 (2d Cir. 1996).  "It is the unlawful agreement itself which constitutes the crime."  *United States v. Martino*, 759 F.2d 998, 1004 (2d Cir. 1985); *see Iannelli v. United States*, 420 U.S. 770, 770 n.10 (1975).  The government does not have to prove the substantive offense in order to prove the conspiracy. *Pickney*, 85 F.3d at 8.  Further, the United States does not have to prove the commission of an overt act in furtherance of a drug conspiracy.  *United States v. Anderson*, 747 F.3d 51, 60 n.7 (2d Cir. 2014).  The central concern in a conspiracy case is whether the defendant agreed with at

least one other person to commit the target offenses.  *United States v. Rosa*, 17 F.3d 1531, 1544 (2d Cir. 1994).

The government may prove the existence of a conspiracy and a defendant's knowing participation in it entirely through circumstantial evidence.  *Glasser v. United States*, 315 U.S. 60, 80 (1942); *United States v. Huezo*, 546 F.3d 174, 180 (2d Cir. 2008).  A conspiracy is "by its very nature a secretive operation."  *United States v. Provenzano*, 615 F.2d 37, 45 (2d Cir. 1980). Thus, the informal agreement present in most conspiracies must frequently be proven by circumstantial evidence.  *Martino*, 759 F.2d at 1002-04.  Such evidence may include "a defendant's association with conspirators in furtherance of the conspiracy; his presence at critical stages of the conspiracy that cannot be explained by happenstance or his possession of items that are of essential significance to the conspiracy."  *Anderson*, 747 F.3d at 60.  Seemingly innocent acts, viewed in light of all surrounding circumstances, may justify an inference of participation in it.  *United States v. Mariani*, 725 F.2d 862, 865-66 (2d Cir. 1984).  To be sufficient, such evidence "need not have excluded every possible hypothesis of innocence."  *United States v. Soto,* 716 F.2d 989, 993 (2d Cir. 1983).

Each conspirator need not know all the details of the conspiracy, the identity or number of his co-conspirators, as long as that conspirator understands the general nature of the conspiracy.  *Rosa*, 17 F.3d at 1543.  Similarly, the government does not have to prove the identity or number of co-conspirators.  *Rogers v. United States*, 340 U.S. 367, 375 (1951).  The government must prove that the defendant knew of the conspiracy and joined it with the intent to commit the crime or crimes which were the object of the conspiracy.  *Ceballos*, 340 F.3d at 123 (holding that the defendant must have the affirmative intent to make the conspiracy succeed). Here, the underlying substantive offenses were possession with the intent to distribute a

controlled substance and distribution of a controlled substance.  Therefore, the government must establish that the defendant agreed "knowingly or intentionally to possess with intent to . . . distribute or to distribute a controlled substance."  21 U.S.C. § 841(a)(1); *United States v. Torres*, 604 F.3d 58, 65 (2d Cir. 2010).

Even a single act may suffice to establish membership in a conspiracy if it justifies an inference of the requisite knowledge.  *Anderson*, 747 F.3d at 61.  A defendant once found to be a member of a conspiracy, whatever his level of participation, may be criminally responsible for acts of which he is unaware by persons whose existence is unknown to him, if done as part of the conspiratorial design.  *United States v. Cirillo*, 468 F.2d 1233, 1239 (2d Cir. 1972).  Evidence of the entire scope of the conspiracy is admissible against each co-conspirator.  *United States v. Nersesian*, 824 F.2d 1294, 1304 (2d Cir. 1987).  "An individual defendant in a drug conspiracy may only be held responsible, under 21 U.S.C. § 846, for the drug quantity which was reasonably foreseeable to that defendant."  *United States v. Feliciano*, 26 Fed. Appx. 55, 58 (2d Cir. 2001) (citing *United States v. Martinez*, 987 F.2d 920, 925-26 (2d Cir. 1993)); *see also United States v. Adams*, 448 F.3d 492, 500 (2d Cir. 2006).  An individual defendant is also responsible for the drug quantity in which he or she personally participated.

### b.  Count 2

Count 2 of the indictment charges the defendants with possession of a firearm in furtherance of a drug trafficking crime.  The elements of this offense are as follows:

First, that the defendant committed a drug trafficking crime for which he might be prosecuted in a court of the United States.

Second, that the defendant knowingly possessed a firearm in furtherance of that drug trafficking crime.

8

Conspiracy to possess a controlled substance with the intent to distribute it is a drug trafficking crime. *See United States v. Meggett*, 875 F.2d 24, 27 (2d. Cir 1989).

A "firearm" is defined as any weapon that will or is designed to or may be readily converted to expel a projectile by the action of an explosive. *See* 18 U.S.C. § 921(a)(3). It is not necessary for the government to present the firearms as exhibits at trial provided there is some evidence, such as the testimony of an observer, that would permit the jury to infer the object involved was a firearm. *See United States v. Beverly*, 99 F. 3d 570, 572 (3d Cir. 1996). Here, the government intends to offer into evidence several firearms recovered from Spencer's residence and two firearms recovered from Russo's truck. The government also anticipates testimony regarding the defendants' and coconspirators' possession of firearms throughout the conspiracy.

The government intends to request a *Pinkerton* instruction in connection with Count 2, which is appropriate in connection with a violation of Title 18, United States Code, Section 924(c). *United States v. Masotto*, 73 F.3d 1233, 1240 (2d Cir. 1996) ("It is well-settled in this Circuit that a jury may be instructed on the *Pinkerton* theory of liability in connection with a charged violation of § 924(c).") "Under a *Pinkerton* theory of liability a conspirator can be held responsible for the substantive crimes committed by his coconspirators to the extent those offenses were reasonably foreseeable consequences of acts furthering the unlawful agreement, even if he did not himself participate in the substantive crimes." *Masotto*, 73 F.3d at 1239 (citing *United States v. Romero*, 897 F.2d 47, 51 (2d Cir. 1990) (internal quotations omitted)).

In order for the defendants to be convicted of Count 2, the government must first prove the predicate drug trafficking crime, which is conspiracy to possess with intent to distribute and to distribute controlled substances. Accordingly, the defendants may be convicted of Count 2 if

the jury finds that they conspired to possess with intent to distribute or to distribute controlled substances, that at least one of their coconspirators possessed a firearm in furtherance of the conspiracy, and that their coconspirators' possession of a firearm was reasonably foreseeable under *Pinkerton*.   Whether a violation of Title 18, United States Code, Section 924(c) was reasonably foreseeable is a question of fact for the jury.  *Id.* at 1241.

## IV.   Legal Issues

### a.   Statements of Defendants and Coconspirators

#### i.   General

Federal Rule of Evidence 801 governs the admission of non-hearsay statements, including those made by party opponents and co-conspirators.  It provides in pertinent part:

> (d) Statements That Are Not Hearsay.  A statement that meets the following conditions is not hearsay:
> . . .
>> (2) An Opposing Party's Statement.  The statement is offered against the opposing party and:
>>> (A) was made by the party in an individual or representative capacity;
>>> (B) is one the party manifested that it adoped or believed to be true;
>> . . .
>>> (E) was made by the party's coconspirator during and in furtherance of the conspiracy.

The government intends to offer evidence of statements the defendants and their coconspirators made during recorded telephone calls and text messages.  The government also intends to offer evidence of statements Spencer made after his arrest on September 5, 2013.  Under Federal Rule of Evidence 801(d)(2), such evidence is not hearsay because the declarants are party opponents. *See e.g. United States v. Meskini*, 319 F.3d 88, 93 (2d Cir. 2003); *United States v. Inserra*, 34 F.3d 83, 93 (2d Cir. 1994); Fed. R. Evid. 801(d)(2).

#### ii.   *Bruton* is Inapplicable to Spencer's Post- *Miranda* Statement

Following his arrest on September 5, 2013, Spencer gave a brief post-*Miranda* statement to BEST agents.  In that statement, which the government intends to offer at trial against only Spencer, Spencer laughed and said, "You got me" after agents played intercepted communications for him.

In *Bruton v. United States*, 391 U.S. 123 (1968), the Supreme Court "held that a defendant is deprived of his Sixth Amendment right of confrontation when the facially incriminating confession of a nontestifying codefendant is introduced at their joint trial, even if the jury is instructed to consider the confession only against the codefendant."  *Richardson v. Marsh*, 418 U.S. 200, 207 (1987).  When a defendant's confession implicates his co-defendants, *Bruton* requires "a redaction and substitution adequate to remove the overwhelming probability that a jury will not follow a limiting instruction that precludes its consideration of a redacted confession against a defendant other than the declarant."  *United States v. Jass*, 569 F.3d 47, 60 (2d Cir. 2009).

"[A] statement cannot," however, "be the basis for a *Bruton* error if it is incriminatory only when linked with evidence introduced later at trial."  *United States v. Wallace*, 178 F. App'x 76, 80 (2d Cir. 2006) (citing *Richardson*, 41 U.S. at 208).  And thus "the appropriate analysis to be used when applying the *Bruton* rule requires that the court view the redacted confession in isolation from other evidence introduced at trial."  *United States v. Rivera*, __ F. Supp. 3d __, No. 13-CR-149 (KAM), 2015 WL 502080, at *15 (Feb. 5, 2015) (brackets omitted) (quoting *United States v. Williams*, 936 F.2d 698, 700 (2d Cir. 1991)); *see Jass*, 569 F.3d 62 ("In making this determination, we view the redacted statement in isolation to evaluate its likely impact on the jury.").

Spencer's statement does not implicate Lloyd at all.  Accordingly, *Bruton* is inapplicable.  Furthermore, the government respectfully requests that the Court give the following limiting instruction following testimony regarding Spencer's statement: The testimony you just heard regarding defendant Spencer's statement to law enforcement may not be considered or discussed by you in any way with respect to the other defendant on trial, Patrick Lloyd.  To the extent you find the testimony credible and worthy of weight, it must only be considered with respect to the guilt or innocence of defendant Spencer.  You are cautioned that the evidence of one defendant's statement to the authorities after his arrest about his own conduct may not be considered or discussed by you in any way with respect to any defendant on trial other than the defendant who made the statement.  *See Jass*, 569 F.3d at 53; *see also* 1-5 Modern Federal—Criminal ¶ 5.07, at Instruction 5-20.

### iii.  Co-conspirators' Statements

The government also intends to offer evidence of conversations between co-conspirators during the course of the conspiracy.

Under Federal Rule of Evidence 801(d)(2)(E), the government may offer co-conspirators' statements made "during the course and in furtherance of the conspiracy" provided the necessary pre-requisites are met.  *See Bourjaily v. United States*, 483 U.S. 171 (1987); *United States v. Maldonado-Rivera*, 922 F.2d 934, 962 (2d Cir. 1990).  The government must demonstrate by a preponderance of the evidence that (1) a conspiracy existed; (2) the declarant and defendant participated in the conspiracy; (3) the conspiracy was in existence when the statement was made; and (4) the statement was made in furtherance of the conspiracy.  *See Bourjaily*, 483 U.S. 171; *United States v. Diaz*, 176 F.3d 52, 82 (2d Cir. 1999).  *Crawford v. Washington*, 541 U.S. 36 (2004), has not affected this analysis because "the Supreme Court has indicated that statements

in furtherance of a conspiracy are non-testimonial for purposes of the Confrontation Clause, and are therefore not covered by its protections." *United States v. Shyne*, 617 F.3d 103, 108 (2d Cir. 2010).

Statements in furtherance of a conspiracy include statements among co-conspirators to inform one another of the progress or status of the conspiracy or serve to foster trust and cohesiveness between and among the co-conspirators. *United States v. Orena*, 32 F.3d 704, 713 (2d Cir. 1994) (citation omitted). Statements may provide information, reassurances, seek assistance or help to promote or carry out criminal activity. *United States v. Rivera*, 22 F.3d 430, 436 (2d Cir. 1994); *United States v. Tracy*, 12 F.3d 1186 (2d Cir. 1993).

Statements of co-conspirators are admissible against a defendant even where the co-conspirators are not also defendants at the trial. *United States v. Celaya-Garcia*, 583 F.2d 210 (5th Cir. 1978). A co-conspirator's statements could themselves be probative of the existence of a conspiracy and the participation of both the defendant and the declarant in the conspiracy. *Bourjaily*, 483 U.S. at 180 (out of court statements that co-conspirator had a "friend" who had agreed to buy cocaine, and who would meet informant and take possession of drugs, corroborated by defendant's appearance at appointed place, established existence of conspiracy and defendant's participation, and that defendant was "friend" mentioned by co-conspirator). Further, a statement made in furtherance of the conspiracy need not be made to a co-conspirator to be admissible. *United States v. James*, 712 F.3d 79, 106 (2d Cir. 2013), *cert. denied*, 134 S.Ct. 2660 (2014).

"As a concession to the practicalities of proof, since an entire case cannot be put in simultaneously but must proceed in sequence, the trial court in its discretion may admit a particular piece of evidence "subject to connection." *United States v. Ziegler*, 583 F.2d 77, 80

13

(2d Cir. 1978); *see also United States v. Geaney*, 417 F.2d 1116, 1120 (2d Cir. 1969).  This is the preferable course in the interest of judicial economy.  *See United States v. Vinson*, 606 F.2d 149 (6th Cir. 1979).  Then, when all the evidence is in, the trial judge must determine "whether in his view the prosecution has proved participation in the conspiracy, by the defendant against whom the hearsay is offered, by a fair preponderance of the evidence."  *Geaney*, 417 F.2d at 1120.  The determination of this issue by the Court should be outside the presence of the jury, and the Court should not advise the jury of the Court's findings that the Government has satisfactorily proved the conspiracy.  *See Vinson*, 606 F.2d at 153.  However, the Court should inform the jury that such evidence is admissible "to consider along with all the other evidence in determining whether they are convinced of a defendant's guilt beyond a reasonable doubt."  *United States v. Mastropieri*, 685 F.2d 776, 788 (2d Cir. 1982).

### b.  Audio Recordings and Transcripts

#### i.  General

As described above, the government intends to offer evidence of recorded telephone conversations and text messages involving the defendants and their coconspirators which were intercepted pursuant to a Title III order.

As stated above, recordings of a defendant's conversations are direct evidence of the conversations and constitute non-hearsay admissions of party opponents under Federal Rule of Evidence 801(d)(2)(A).  Similarly, statements by the defendants' coconspirators in recorded conversations are non-hearsay and admissible against the defendants where such statements are made by a co-conspirator during the course and in furtherance of the conspiracy.  Fed. R. Evid. 801(d)(2)(E).  Such statements may also be admissible as non-hearsay adoptive admissions.  Fed. R. Evid. 801(d)(2)(B).

14

Audio recordings are independently admissible even where one or more parties to the conversation also testifies, *Nixon v. United States*, 487 F.2d 700 (D.C. Cir. 1973); *United States v. Bonanno*, 487 F.2d 654, 659-60 (2d Cir. 1973), based upon a showing of authenticity, accuracy, and relevance. *United States v. Fuentes*, 563 F.2d 527, 532 (2d Cir. 1977); *United States v. Knohl*, 379 F.2d 427, 440 (2d Cir. 1967). The decisions of the Second Circuit "reveal a clear preference for the admission of recordings notwithstanding some ambiguity or inaudibility, as long as the recordings are probative." *United States v. Arango-Correa*, 851 F.2d 54, 58 (2d Cir. 1988).

### ii.  Authentication of Intercepted Telephone Calls

To properly authenticate or identify an item of evidence, the offering party must produce sufficient evidence "that the item is what the proponent claims it is." Fed. R. Evid. 901. "The bar for authentication is not particularly high" and evidence is properly authenticated if a reasonable juror could "find in favor of authenticity." *United States v. Gagliardi*, 506 F.3d 140, 151 (2d Cir. 2007); *United States v. Hamilton*, 334 F.3d 170, 186 (2d Cir. 2003). Such evidence may be entirely circumstantial and "the proponent is not required to 'rule out all possibilities inconsistent with authenticity.'" *United States v. Tin Yat Chin*, 371 F.3d 31, 37 (2d Cir. 2004) (quoting *United States v. Pluta*, 176 F.3d 43, 49 (2d Cir. 1999)). Authentication is an issue of admissibility, leaving the issue of the overall reliability of the evidence to the jury.

Authentication of telephone calls may be accomplished in a variety of ways. *United States v. Dhinsa*, 243 F.3d 635, 658 (2d Cir. 2001) (noting that authentication "need not fall into any set pattern"). The proof may be direct or circumstantial. *United States v. Vayner*, 769 F.3d 125, 130 (2d Cir. 2014). In general, an audio recording is admissible if the proponent establishes the identity of the speaker. *Dhinsa*, 243 F.3d at 659 (quotation omitted) (noting that a mere

15

assertion of identity by the speaker is usually not in and of itself sufficient for authentication). Testimony from someone familiar with the caller's voice is sufficient. *Id.*; Fed. R. Evid. 901, ex. 5 (noting that aural voice identification does not require expert testimony); *United States v. Tropeano*, 252 F.3d 653, 661 (2d Cir. 2001) (noting identification could be from a participant on the recording or an individual that heard the conversations at the time they were made such as a law enforcement officer).

Authentication may be established through "the similarity between what was discussed by the speakers and what each subsequently did." *Dhinsa*, 243 F.3d at 659 (quotation omitted). The identity of the speaker may also be demonstrated by "virtue of its disclosing knowledge of facts known peculiarly to him." *Dhinsa*, 243 F.3d at 659.

Finally, an audio recording may be authenticated through evidence that the recording equipment was functioning properly at the time of the recording combined with surveillance of the meeting/conversation. *United States v. Fuentes*, 563 F.2d 527, 531-32 (2d Cir. 1977) (holding that there is "no requirement that the tapes be put in evidence through the person wearing the recorder or, for that matter, through a contemporaneous witness to the recorded conversations").

The government anticipates authenticating the recorded conversations here in several ways. First, the recording equipment was functioning properly. The intercepted telephone calls were monitored in real time through the "wire room" in Canton, New York. Second, the government will present testimony from agents and witnesses involved in the case that they are familiar with the voices on the recordings, including defendants Lloyd and Spencer. Finally, participants in the conversations will testify that they recognize the voices, participated in the recorded conversations, and that the recordings are true and accurate.

16

### iii.  Authentication of Intercepted Text Messages

Electronic messages may also be authenticated in several different ways, although Federal Rule of Evidence 901 does not provide any specific rule with regard to text messages. *United States v. Sterlin*, 466 Fed. Appx. 792, 797 (11th Cir. 2012).  Evidence that an electronic message was obtained through a process or system that produces an accurate result is sufficient foundation under Rule 901.  Fed. R. Evid. 901(9).  Like telephone conversations, electronic messaging may be authenticated through similarities between the content of the message and actions of parties involved, *Sterlin*, 466 Fed. Appx. at 797, or when the content of the electronic message contains information particular to the defendant.  *United States v. Fluker*, 698 F.3d 988, 1000 (7th Cir. 2012) (holding that emails contained information about bank accounts and housing programs that were known to the defendant).  Additionally, evidence that a particular person was using the telephone that generated the messages is also sufficient.  *United States v. Lundy*, 676 F.3d 444, 454 (5th Cir. 2012) (evidence that defendant was using phone at the time of his arrest was sufficient to authenticate text messages from that phone).

Here, again, the government intends to introduce evidence that the text messages were intercepted by the BEST during the eavesdropping investigation – a computer generated process whereby agents receive the text messages directly from the telephone company.  The messages were intercepted in real-time and many of the text messages coincided with surveillance of the defendants and their coconspirators.

### iv.  Transcripts

In order to aid the jury, the Government may offer transcripts of the audio recordings. *United States v. Byrant*, 480 F.2d 785, 788-90 (2d Cir. 1973).  Additionally, while there may be

inaudible portions of the audio recordings, the recording is admissible so long as the inaudible portions of the recordings are not so severe that they render the recordings untrustworthy. *Id.*

In *United States v. Chiarizio*, the court stated that "[i]n cases where the defense and prosecution disagree as to the contents of the tape, the proper procedure is for the jury to receive transcripts of both sides' versions." *United States v. Chiarizio*, 525 F.2d 289, 293 (2d Cir. 1975). In such cases, the court should also listen to the tapes, comparing them to the transcripts. *Chiarizio*, 525 F.2d 293.

If the jury so requests, it is within the discretion of the trial judge to permit the jury to rehear the tapes and to utilize the transcripts while the tapes are being replayed during deliberation. *United States v. Alfonso*, 552 F.2d 605 (5th Cir. 1977); *United States v. Cioffi*, 493 F.2d 1111 (2d Cir. 1974). It is permissible for the jury to have the transcripts of conversations during deliberations. *United States v. Koska*, 443 F.2d 1167 (2d Cir. 1971).

Regarding the audio recordings and transcripts, so long as the parties agree to the accuracy of a transcript, or are permitted to provide competing versions to the jury, it is proper for a trial court to admit the tape into evidence and publish the transcript to the jury for demonstrative purposes. *See United States v. Carson*, 464 F.2d 424, 436-37 (2d Cir. 1972) (approving procedure for transcript of English language conversations). If the defense contests the accuracy of any portion of the offered transcript, it may submit its own version. *United States v. Ben-Shimon*, 249 F.3d 98, 101 (2d Cir. 2001); *Carson*, 464 F.2d at 436-37.

In this case, the government previously provided and/or made available to defense counsel copies of all recorded audio conversations. The government will provide in advance of trial all transcripts of those audio conversations that it will seek to publish to the jury. Absent

any objections regarding the accuracy of the transcripts, the transcripts should be admitted in evidence.

### v.  Summary Chart Under Federal Rule of Evidence 1006

The government intends to offer evidence of text messages intercepted during the BEST's Court authorized Title III investigation.   The raw data of these text messages is voluminous and the government intends to offer a summary chart of the text messages under Federal Rule of Evidence 1006.   The summary chart provides a time and date for each text message, the verbatim content of the message and information about who sent and received the text message.

Rule 1006 provides that "[t]he contents of voluminous writings, recordings, or photographs which cannot conveniently be examined in court may be presented in the form of chart, summary or calculation."  Fed. R. Evid. 1006.  The rule defines "voluminous" as materials "that cannot be conveniently examined in court."  *Id*.; *see, e.g., United States v. Yousef*, 327 F.3d 156, 157-58 (2d Cir. 2003) (upholding use of summary charts "because the Government was . . . entirely within its rights to use charts to draw the jurors' attention to particular evidence culled from a voluminous set of records"); *see also United States v. Blackwood*, 366 Fed. Appx. 207, 212 (2d Cir. 2010) (unpublished).

"[C]harts may be introduced either through a person who prepared the chart or a person who has reviewed the underlying documents and confirmed the accuracy of the chart."  *United States v. Bertoli*, 854 F. Supp. 975, 1055 (D.N.J. 1994). Here, the government will introduce summary charts through an agent who prepared the charts.  *Id*. at 1055.

As required by the rule, the United States has provided the defendant with copies of the documents supporting the chart and those copies will be available during trial. In addition, the

chart has previously been made available to the defense, and, to the extent that it is revised or a new one is created, the government will provide it without delay.

Alternatively, if the Court does not admit the chart under Federal Rule of Evidence 1006, the United States will assert the chart should be admitted as a demonstrative aid under Federal Rule of Evidence 611.  Such demonstrative aids typically are permissible to assist the jury in evaluating the evidence, provided the jury is forewarned that the charts are not independent evidence. *See United States v. Taylor*, 210 F.3d 311, 315 (5th Cir. 2000); *see also United States v. Ogba*, 526 F.3d 214, 225 (5th Cir. 2008) (organizational chart); *United States v. Janoti*, 374 F.3d 263, 273 (4th Cir. 2004); *United States v. Martinez*, 1998 WL 613572, at *5 (2d Cir. 1998) (unpublished) (demonstrative aid admitted in court's discretion).

### c.  Chain of Custody

An uninterrupted chain of custody is not a prerequisite to admissibility of an exhibit. *United States v. Olson*, 846 F.2d 1103, 1116 (7th Cir. 1988).  Gaps in the chain go to the weight of the evidence, not its admissibility.  *United States v. Morrison*, 153 F.3d 34, 57 (2d Cir. 1998); *United States v. Hon*, 904 F.2d 803, 809-810 (2d Cir. 1990).  "If the trial judge is satisfied that in reasonable probability the evidence has not been altered in any material respect, he may permit its introduction."  *Olson*, 846 F.2d at 1116 (quotation omitted); *see also United States v. Hemmings*, 482 Fed. Appx. 640, 643-44 (2d Cir. 2012) (holding it was not abuse of discretion to admit drugs into where the government did not call the confidential informant who handled drugs as part of the chain of custody and noting that an alleged break in chain of custody for crack cocaine went to weight of evidence, not its admissibility).

"Establishing a chain of custody is one form of proof sufficient to support a finding that the matter in question is what its proponent claims."  *United States v. Mendel*, 746 F.2d 155, 167

20

(2d Cir. 1984); *United States v. Casamento*, 887 F.2d 1141, 1188 (2d Cir 1989).  Proof of the connection of an exhibit to the defendants may be made by circumstantial evidence.  *United States v. Mendel*, 746 F.2d at 167; *United States v. Natale*, 526 F.2d 1160, 1173 (2d Cir. 1975).

### d.  Witness Cooperation

Four of the government's trial witnesses have entered into plea and cooperation agreements which set forth, among other things, their obligation to cooperate with the government and what will happen if they breach the agreement.

The Second Circuit has allowed the government to develop the circumstances surrounding a witness's cooperation, or other matter damaging to his credibility, during direct examination.  *United States v. Cosentino*, 844 F.2d 30, 33 (2d Cir. 1988).  This exception to the rule prohibiting a party from impeaching his own witness, serves to avoid the inference that the government is attempting to conceal evidence of a witness's bias from the jury.  Judge Oakes in *United States v. Borello*, 766 F.2d 46, 57 (2d Cir. 1985) and Judge Mulligan in *United States v. Edwards*, 631 F.2d 1049, 1052 (2d Cir. 1980) have explained this rule:

> The rule of *Arroyo-Angulo* and the doctrine enunciated in *Singh* indicate that the Government may not introduce the entire cooperation agreement on direct examination of its witness since the witness' credibility has not been attacked and the entire cooperation agreement bolsters more than it impeaches. . . .  However, the elicitation of the fact of the agreement and the witness' understanding of it, as a motivation for the witness to testify for the Government, should be permitted on direct examination in order to anticipate cross-examination by the defendant which might give the jury the unjustified impression that the Government was concealing this relevant fact.

*Id.*  What is important, as *Edwards* recognized, is that although the prosecutor should not offer a written cooperation agreement into evidence during direct examination, it is permissible for the prosecutor to both inquire as to the fact that a cooperation agreement has been signed, and permit the witness to identify this agreement and to explain his understanding of its terms.  *Edwards*,

631 F.2d at 1052.  This procedure, as *Edwards* says, avoids having "the jury . . . learn at that time that the agreement was revocable if the witness perjured himself, that upon such perjury the witness might be subject to prosecution for any and all crimes, and anything the witness had previously said could be held against him."  *Id.*  Thus, the allowed or admissible witness' direct testimony merely concerns his or her motive for cooperating with the Government.

However, if the defense attacks the witness' credibility on cross examination, the government may offer the witness' cooperation agreement into evidence on redirect examination. *United States v. Arroyo-Angulo*, 580 F.2d 1137, 1146 (2d Cir. 1978).

### e.  Admissibility of Certain Events Related to the Organization

The government intends to offer evidence of several events related to the organization. Although these events may demonstrate the defendants committed other crimes, the evidence is not offered for that purpose.

Here, as stated above, the government intends to offer evidence of: (1) Lloyd robbing Malu in the spring of 2012; (2) Lloyd and Spencer's assault and robbery of members of  Malu's rival drug trafficking organization on June 20, 2012; (3) the rival organization's robbery and assault of the defendants on October 22, 2012; (4) Lloyd's assault and attempted kidnapping of Catherine Berry on February 16, 2013; (5) Lloyd's arrest on April 11, 2013; (6) Codi Burke's attempt to sell a handgun for the organization; (7) Jessica Monaghan's assault of Leslie Moore while on the telephone with Spencer; and (8) Lloyd, Spencer, and Monaghan's efforts to deter Berry from testifying against Lloyd at his state court trial (collectively referred to as the "event evidence"). This event evidence is necessary to complete the story of the defendants' crime.  In the alternative, this event evidence is admissible under Federal Rule of Evidence 404(b).

### 1.  The event evidence admissible as intrinsic evidence necessary to complete the story of the crime.

Evidence of uncharged misconduct is not considered evidence of "other crimes, wrongs or acts" under Rule 404(b) if the conduct "arose out of the same transaction or series of transactions as the charged offense, if it is inextricably intertwined with the evidence regarding the charged offense, or if it is necessary to complete the story of the crime on trial." *United States v. Robinson*, 702 F.3d 22, 37 (2d Cir. 2012) (quoting *United States v. Carboni*, 204 F.3d 39, 44 (2d Cir. 2000) (evidence of uncharged falsification of business inventory admitted to prove charged crime of making false statements to obtain a line of credit)); *United States v. Gonzalez*, 110 F.3d 936, 942 (2d Cir. 1997); *United States v. McCallum*, 348 Fed. Appx. 693, 695 (2d Cir. 2009) (defendant's prior drug activity was "crucial background evidence that gave coherence to the basic sequence of events leading up to and comprising the charged conspiracy"); *see also United States v. Prosper*, 375 F. App'x 190, 197 (3d Cir. 2010) (evidence of "unexplained wealth" supported by defendant's "reported annual income . . . for tax purposes" is not "evidence of 'other crimes' for purposes of Rule 404(b).")

Here, the evidence is inextricably intertwined with the evidence of the defendants' drug trafficking conspiracy and necessary to complete the story of the conspiracy, including the involvement of firearms. The first event, Lloyd's robbery of Malu explains how Lloyd and Spencer made their way to Massena and how they met their coconspirators, including Burke, Monaghan, and Berry. Prior to that robbery, Lloyd and Malu distributed drugs together in the Massena area. During that time, Burke, Monaghan, and Berry met Lloyd through Malu. As a result of that robbery, Lloyd and Malu became rival drug dealers.

Shortly thereafter, Burke and Lloyd agreed to distribute drugs together, but Burke first needed to be bailed out of jail. On June 20, 2012, in order to obtain the bail money, Lloyd and Spencer entered an apartment occupied by members of Malu's rival drug trafficking

organization, assaulted them, and stole their drugs.  Lloyd and Spencer, along with their coconspirators, distributed those drugs and made enough money to bail Burke out of jail.  Burke then began distributing for the organization.

As part of the rivalry, Lloyd and Spencer attempted to get dealers distributing for Malu to leave the rival organization and start distributing for them.  In the fall of 2012, at Malu's direction, Berry agreed to begin distributing controlled substances for Lloyd and Spencer.  However, she continued to work for Malu and reported back to him.  On October 22, 2012, members of the Malu organization assaulted Lloyd and Spencer after Berry told Malu where they were.

When Lloyd learned that Berry set him up, he and his former girlfriend assaulted her.  Berry reported the assault and attempted kidnapping to the police on February 20, 2013.  Lloyd and his former girlfriend were arrested, but released.  Lloyd continued to run the organization.  Then, on April 11, 2013, Lloyd was arrested at Jandrew's apartment.  He was held in custody.

After Lloyd's arrest, Spencer took over managing the organization, while Lloyd continued to direct his coconspirators from jail.  During that time, Brailsford and Garcia were stopped with heroin and cocaine as described above.  They were arrested and held in jail.  The organization gave Leslie Moore, another coconspirator, money to put in Brailsford and Garcia's commissary accounts.  However, Moore did not follow through.  When Monaghan learned that Moore did not follow directions, she went to Moore's residence, called Spencer, and assaulted Moore while Spencer listened on the telephone.  It was important to the organization that Brailsford and Garcia receive the money because it would discourage them from speaking to authorities about the organization.

24

Later that summer, with Lloyd's trial for the assault and attempted kidnapping of Berry approaching, Lloyd, Spencer, and Monaghan decided to try to stop Berry from testifying.  With Lloyd's knowledge and approval, Monaghan and Spencer promised Berry $20,000 if she recanted her statement.  They paid her some of that money.  Berry went to a private investigator and recanted.  Monaghan and Spencer then tried to get Berry to avoid service of a subpoena by paying her and Burke to leave town and stay in a hotel in another county.  Ultimately, Berry was served and showed up at the trial.  This was all done in furtherance of the conspiracy and to protect Lloyd, the leader of the organization.

### 2. The event evidence is admissible under Federal Rule of Evidence 404(b).

In the alternative, the government seeks to introduce the evidence pursuant to Federal Rule of Evidence 404(b).  Federal Rule of Evidence 404(b) provides:

> (b) Crimes, Wrongs, or Other Acts.
> (1) Prohibited Uses.  Evidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character.
> (2) Permitted Uses; Notice in a Criminal Case.  This evidence may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan knowledge, identity, absence of mistake, or lack of accident.  On request by a defendant in a criminal case, the prosecutor must:
> (A) provide reasonable notice of the general nature of any such evidence that the prosecutor intends to offer at trial; and
> (B) do so before trial—or during trial if the court, for good cause, excuses lack of pretrial notice.

Under Rule 404(b), the government is precluded from offering evidence of uncharged misconduct or other acts in order to prove the character of the person and that the defendant acted in conformity therewith.  "The [Second Circuit] follows the 'inclusionary approach,' pursuant to [which a court] admit[s] all 'other act' evidence that does not serve the sole purpose of showing the defendant's bad character and that is neither overly prejudicial under Federal Rule

of Evidence 403 nor irrelevant under Federal Rule of Evidence 402." *United States v. Curley*, 639 F.3d 50, 56 (2d Cir. 2011).  The Court has the discretion to admit evidence that "serves and non-propensity purpose, including state of mind."  *Curley*, 639 F.3d at 57 (internal quotations omitted) (*citing United States v. Edwards*, 342 F.3d 168, 176, 180 (2d Cir. 2003)).

In order to present evidence under 404(b), the government must demonstrate that: (1) the evidence is offered for a proper purpose, (2) it is relevant to a material issue in the case, (3) the probative value is not substantially outweighed by its prejudicial effect, and (4) the court will provide an appropriate limiting instruction.  *United States v. Brand*, 467 F.3d 179, 196 (2d Cir. 2006).  "Other act evidence serves a proper purpose so long as it is not offered to show the defendant's propensity to commit the offense."  *Curley*, 639 F.3d at 57 (internal quotations omitted) (*citing United States v. Pitre*, 960 F.2d 1112, 1118-19 (2d Cir. 1992)), s*ee also United States v. Gonzalez*, 922 F.2d 1044, 1056 (2d Cir. 1991) (holding that a determination of whether the government has offered other acts evidence for a proper purpose depends largely on the facts of the case).   Here, the government can satisfy all four requirements for admission.

The evidence is offered for a proper purpose: to establish knowledge, motive, and intent.  The evidence is relevant to the defendants' mental state, a material issue in the case.  The "chain of inferences necessary to connect the evidence with the ultimate fact is not unduly long" as the event evidence plainly demonstrates that the defendants distributed controlled substances and engaged in a rivalry with the Malu organization.  The event evidence shows the connections between coconspirators and the existence of the conspiracy.  It also directly pertains to the defendants' knowledge that firearms were involved in the conspiracy and the foreseeability of the possession of those firearms in furtherance of the conspiracy.

Applying Federal Rule of Evidence 403's balancing test, the evidence should be admitted as its potential for unfair prejudice does not substantially outweigh its probative value.  Other acts evidence that tends to prove a fact not at issue or "excite emotions against the defendant" may create a prejudicial effect.  *See Curley*, 639 F.3d at 57.  Here, the other acts evidence does not tend to prove a fact not in issue or excite emotions.  The event evidence shows what the defendants did as part of their drug trafficking conspiracy and is highly probative of facts in issue, specifically the defendants' knowledge, motive and intent.

Respectfully submitted,


/s/ Katherine Kopita
Katherine Kopita
Cyrus P.W. Rieck
Assistant United States Attorneys
Bar Roll Nos. 517944, 518933


**Certificate of Service**

I, Katherine E. Kopita, hereby certify that I served a copy of this notice on defense counsel by electronic filing.

August 3, 2015                                    */s/ Katherine E. Kopita*
                                                       Katherine E. Kopita